Good afternoon, Illinois Appellate Court, 1st District Court is now in session. The First Division, the Honorable Justice Carl Anthony Walker presiding, case number 1-8-0207, People v. Thomas Lemire. Good afternoon, everybody. Thank you, Darren. I'm Justice Walker. I have with me here today Justice Pierce and Justice Coghlan, and I'd like to have the attorneys to please introduce yourselves. My name is Attorney Leslie Gould, representing the people of the state of Illinois. Good afternoon. Good afternoon. Good afternoon. This is Debra Pugh of the State Appellate Defender representing Ms. DuLanoir. Good afternoon. All right. And we generally give everyone 20 minutes for each side, total time. So I'd like to know, let's start with you, Ms. Pugh. How much time do you need today? I think I'll take maybe 15 minutes for the opening and then maybe five minutes for the rebuttal, if that's OK. Yes, that's absolutely fine. And Ms. Gould, how much time do you need today? I think I'll need maybe 12 minutes. OK, and that's fine as well. OK, so what we normally do, we're pretty flexible on our time. First of all, I need to apologize to you, too, that we're starting late. What happened here is that there was another division that had a case going earlier, and they caused us to start more than a half hour late with our first case. And so we're just behind now as we get to this case. So we do apologize. But it was we've been sitting here ready to go the entire time, just waiting on that other case to finish up in the courtroom. So what we do is if we if we do ask a lot of questions sometimes, and if we're asking you questions and cause you to run out of time and there are some points that you really wanted to make to us, we're willing to give you some extra time so you can get those points in. So if you need an extra two or three minutes to do that, we're willing to give you that time. So don't get frustrated if we tell you you're out of time. I will. I may tell you you're out of time. I will let you know that I'm going to let you finish your points. OK, so, Ms. Gould, we will start with you. As I said, my name is Deborah Gould of the Office of the State Appellate Defender, and I represent the appellant, Thomas Lenoir. So the crux of this case is whether the state proved that Mr. Lenoir knew that he did not have permission to drive Ms. Johnson's car. So it's partially a credibility issue, but it's partially whether they literally, whether the state literally presented evidence to show that he did not know that he knew that he did not have permission to drive it. So the obvious and arguably essential question for the state to have asked Ms. Johnson at trial was, did you tell him that he wasn't allowed to drive your car? But the state didn't ask that question, and we don't know why the state didn't ask it. And crucially, we don't know what Ms. Johnson would have said had she been asked that. But it's not this court's job to fill in the holes in the state's evidence. Rather, it's to try to determine what reasonable inferences can be drawn from the evidence that the state did present. And the state presented evidence that would show that Mr. Lenoir believed that he possessed it legally based on what Officer Morales testified to about him approaching police voluntarily and engaging about the car, trying to prevent it from getting a ticket. And Ms. Johnson's major credibility issues, that to whatever degree this court is tempted to fill in the holes of what she said, her credibility issues on literally every point that she testified to undermine any inferences that can be drawn. So this is what we do know. Ms. Johnson owned the car, but she was not permitted to drive it. She bought the car with Mr. Lenoir's help with the intention that he would be the driver. And she said that he drove it every day. So this is not a standard situation of somebody driving a friend's car once. She bought this car for him to drive daily. But most importantly, to show his mindset is what happened when the police tried to ticket the car. So he had parked illegally in an alley not near his house. This was about a mile and a half away from where Ms. Johnson said that he lived. And he saw that the police were ticketing his car, ticketing the car that he'd parked illegally. And he came out and approached them. They didn't see him until he behaved exactly as most people would do if they realized that their friend's car that they were borrowing was about to get ticketed. He came out and said, whoa, that's my car. Let me move it. And then and then he was immediately arrested because by then the police had realized that the car had been reported stolen. But and then he said, oh, well, actually, the owner's in jail. So what he did. And so that's why he has a car. So what he did, he voluntarily engaged. And so I think we're going to have a very hard time finding any possession of a stolen motor vehicle case that involves somebody voluntarily interacting with police saying this is my car. If somebody believed that the car that they possessed was converted or stolen, they wouldn't engage with police. They would. The police hadn't seen him and he was not near his house. So he could have easily just slunk away if he thought he was doing something illegal. The fact that he behaved the way anyone would behave to protect their friend's car from getting a ticket suggested he had no idea that Ms. Johnson believed that he was that he was possessing the car illegally. And he clearly believed that she still was in jail, because why would he tell police that? Given it's such an easy thing for police to determine. So what we know is that the state had to prove that Mr. that Mr. Lenoir possessed the car. Of course, he possessed the car. We have to prove that he was not they had to prove that he was not entitled to possess the car and that he knew that the car had been stolen or converted. And Ms. Johnson testified at trial that Mr. that Mr. Lenoir was not permitted to drive the car anywhere but her mother's house. So that covers the element number two, that he wasn't permitted to drive it. So that's proven. But the state never asked, did you tell him that he wasn't permitted to drive it? He knew that he was permitted to drive it daily. He knew that she bought it for him to drive. But they never said, did you tell him that he's not permitted to drive it? And so the state says that to Mr. that Ms. Johnson testified that she told them that she told Mr. Lenoir that he wanted the car back, that she wanted the car back, that he refused to give it to her. This is not true. She never testified that he refused it. The state never said, did you did you tell him that you wanted the car back? There was never a question about, did you tell him that? And indeed, her testimony about any attempts to get the car back was very confused and confusing. She never testified about leaving a message about texting him. She was friends with his wife. She never said. And so I called his wife to get the car back. She just said that she went. She said that she interacted with him twice, once in person and once on the phone. When she was asked about when she interacted with him in person, she said it was maybe March was the most she could say about what had happened. And she said that she saw him on a balcony at the corner around around 64th in California. If you look at the Google Street View of 64th in California, you're not you'll see a lot of single family houses. You'll see some older multiunit buildings, none of which even have an exterior staircase, much less a balcony. So it's very confused. Her testimony really didn't make any sense regarding that. And besides that, the state never said, did you tell him you wanted the car back? The state had an element that they needed to prove and the state didn't prove it. And her testimony was also incredible in so many other ways, too. For instance, she said that she didn't talk to police between March 12th and April 3rd. She was arrested on April and March 12th. She spent five days in jail. She testified that she both called police and went to the police station, but yet said that she didn't talk to police then. So either she's lying, which would be very strange, or she's a person who's a little bit not lucid and having a very hard time communicating. But given that her communication to Mr. Lenoir is the key to this case, what matters the most is, did she communicate to him that he was not allowed to possess the car? The fact that she couldn't communicate that in court really says everything. Then there's also the matter of the call to Officer Morales. Officer Morales said that he called her when the car was found. He looked up who it belonged to, called her, left her a message asking her to call him back. He got a call back shortly thereafter from someone claiming to be her. And before he could even ask her whether Mr. Lenoir had permission to drive the car, she hung up. Now, and she denied ever making this call. The state suggests... I thought the person said that everything you need to know is in the report. She might have said that, but then she hung up, but she said she hung up abruptly. And on cross, he was asked, did you have a chance to ask whether Mr. Lenoir had permission? But, of course, we know that he didn't have permission, so that's not the key point. The key point is whether she told Mr. Lenoir that he didn't have permission. But the main point is that there was an abrupt hang up. Now, the state says, well, maybe it was just some random woman who happened to know about the car and about Mr. Lenoir's arrest and about Officer Morales calling Ms. Johnson and Officer Morales' name and his phone number, but then for some reason impersonated Ms. Johnson, but to no end because she hung up so abruptly that nothing happened. It's far more believable that Ms. Johnson is just not a very good witness, that either she's lying, either she doesn't remember calling him, or she's just not capable of communicating clearly. There are so many other things about her story, about saying that Mr. Lenoir was not allowed to drive the car himself, but she was supposed to drive her to work, but they lived 11 miles apart, and she worked way out in the suburbs at a tool and dye company in nine-hour shifts. So he's supposed to make it from 64th and California to her house on the north side, drive her out to Elk Grove Village, and then sit in the parking lot for nine hours while she works so that he can drive her home without ever driving the car himself. The story just makes no sense. But this entire case comes down to what Ms. Johnson told Mr. Lenoir, but even in the formality of the courtroom, even with the state trying to draw her out, the state did not elicit and didn't even try to elicit the testimony that was most needed, what Mr. Lenoir knew from her about what he was allowed to do with that car. And so why are we to believe now, beyond a reasonable doubt, that this man should have been found guilty of disobeying what she said when she didn't even say it in the courtroom? And so there's no reason to fill in what she said to him when she didn't even fill in. It's the two steps of filling in, filling in what she said in court and then filling in what she said to him. It's a two-step process that the state simply didn't elicit the evidence. And so for these reasons, this court should reverse Mr. Lenoir's conviction for possession of a stolen motor vehicle. And if this court has no further questions on this issue, I'll move on to issue two. You may move on. So this court in both people versus Morales, I'm sorry, people versus Miles and people versus Williams, has found the mandatory class X statute will not use as a predicate offense any offense that would now, meaning the time when the present offense occurred, be adjudicated in a juvenile court rather than an adult conviction. Now, the state doesn't dispute that Mr. Lenoir's 1978 offense from when he was 15 years old would now be adjudicated in a juvenile court, would not be an adult conviction. Nevertheless, the state maintains that that 1978 offense should be used as a predicate offense for the mandatory class X statute. Basically, what the state's argument comes down to is a request that this court ignore the word now in the mandatory class X statute. But that word is there for a reason. It's looking at what is now considered a class two offense or above. But every time this issue has come up before the first district court, this court has rejected it. Most famously in Miles and Williams, the published cases, but also in numerous unpublished cases, one of which I should mention, Denzel Stewart, has been accepted by the Illinois Supreme Court. They accepted the state's petition for leave to appeal in that case. So this case is before the Illinois Supreme Court right now. And in every time the case the state has brought this objection to this issue, they've relied on the same three cases. Fitzsimmons v. Norgal, the Illinois Supreme Court case in 1984, and the appellate cases Bryant and Banks. Now, Fitzsimmons doesn't involve the mandatory class X statute, involves whether a second class two conviction can be used, can be probationable, and it doesn't look to the word now in the statute. It's just not the same issue. Whereas Bryant and Banks did actually involve the mandatory class X statute at issue here. But the key in all of these cases is that nothing had changed for the predicate offense between the time of the predicate offense and the offense at issue. Whereas for Mr. Mr. Lenoir, I mean, he's frankly a veritable tour of everything that's happened in juvenile sentencing from 1978 and so many changes between now and then. And so whereas in Bryant and Banks and Fitzsimmons, even if you'd looked at whether those offenses, whether the predicate offenses would be class two offenses or above at the time of the offense at issue, they would be because nothing had changed in the Juvenile Court Act. Whereas now as a state, the state doesn't dispute that Mr. Lenoir's case would be a juvenile adjudication. Now the state says that the Juvenile Court Act is not retroactive, but of course it's not, but that's not what it's not, that's not what is that issue. What's that issue is the interpretation of the mandatory class X statute. I also want to mention that the state says in its brief that the legislature did never amended the mandatory class X statute to make clear that juvenile adjudications should not be part of it. They never, they never saw what happened in Banks and Fitzsimmons and amended the statute, but it wouldn't have made any sense then because the Juvenile Court Act hadn't changed. But now, of course, the new crime bill, which is not, has no effect in this case, of course, the juvenile crime bill does, or the new crime bill doesn't come into effect for a long time, but it does show that the legislature saw what this court was doing. The legislature saw how this court was interpreting the mandatory class X statute and went several steps beyond that. So now forcible felonies won't be part of it. And the predicate offense is not even, not even juvenile predicate offenses won't be considered for class X, you have to be at least 21 now for the, so the court, the legislature saw what it was doing and went beyond that. Now, as a final matter, the state is mistaken when it says that if this court finds that the mandatory class X statute does not apply, that Mr. Lenoir is still eligible for extended class two sentencing. Even though, but that, and that his, therefore his eight and a half year sentence is still legal. This is not true. His previous class two offense was from 2004, and he received a four year sentence. And so, even assuming he served no pre-sentence credit, he received no pre-sentence credit, presumably he would have been out in 50% of that time, the state provides no reason to think that he wasn't out in 50%, so he would have been out in 2006. And so that means that there's been 11 years between that, between, for that, in between that, for the extended sentence statute. So that statute doesn't apply. Is he out? He must be out by now. Well, he's, well he actually is out. I'm just, I'm just curious. He's eligible for MSR in May. And so his, I realize that has no bearing on what's before us, but I'm just curious. Right, no, he would, he had, if he had gotten the maximum he would have been out in six months ago, as it is now he's scheduled to be to be in May, but of course, moving him down to class two has a major effect on MSR for him. And so, and so this is this issue is in no way moved. And so, if this court does, does find that he is not class X eligible, we would ask that rather than setting him back for resentencing because the sentence will have already been served, that this court simply reduces sentence to class two, frankly, impose whatever sentence this court sees fit, keeping in mind that he was at the bottom of the class two, of the class X range and, and just reduce the sentence to a class two so that he will only have to serve the shorter period of MSR. So, and that's of course only if this court does not reverse his conviction based on the first issue for the state failing to prove him guilty of knowing that he possessed the car illegally. So if this court has no further questions. There's pure you in contact with him. Yes. Okay. All right, that's all I need to know. Thank you. Thank you, Miss few in the school. Let me unmute. Good afternoon, may it please the court opposing Council. Leslie goal for the people of the state of Illinois, your honors, when viewing all of the evidence in the light most favorable to the people to the state. We know from the record that there was sufficient evidence that the defendant was proven guilty beyond a reasonable doubt of possession of stolen motor vehicle. And for that stand at you. I want you to look at more the word the last word in the statute which is conversion. And I think that applicable to these facts, that's really what we're dealing here. And as you know, conversion is when a person who is entitled lawfully to a property is wrongly deprived of that. Also in this, as you know, knowledge is actually embedded in the statute. We knowledge that a vehicle has been converted can be inferred. Isn't conversion, doesn't that consist of an intention to permanently deprive the owner of lawful possession. No, it's not permitted and in fact that's also in the statute. No, no, an intention, an intention to deprive permanently, isn't that part of the conversion. Permanently, I will, I will justice for permanently for that word of permanently I do not believe that whether it. That was his intent to always remain with the vehicle. No, I do not believe that conversion permanency is applicable. As like, in fact, my reading, my reading of the statute, it just says that the person knew the vehicle was stolen or converted. Correct. It's not defined conversion. My understanding of conversion is typically defined of an intention to permanently deprive the true owner of rightful possession. I believe that the respectfully the use of the word permanently is used in our theft statute under the criminal statute, but I do not believe that permanency, the word permanent is applicable to conversion. What was the jury instruction instructed as to what the elements of conversion are in this case. You know, offhand. I don't I do not know I don't know for sure. I got, I got the sense that the prosecution was focused more on the theft, or because the car had been reported stolen that the conversion aspect didn't have that much to play in the trial that they were operating on the premise that he stole the car from her. Well, even if that were the case, the trier fact, hearing all the evidence, believe that to be the case, but us here in the appellate court, discussing this in the facts of the case right now, we are able, and we can factor in the actions of the defendant, and they support whether he converted this car to his, whether he converted the car. They put the car mark, not even the, she purchased the car March 2017. She was arrested. Well, 2017, so this was a 4 day period of where he was driving her to work, driving her kid. Well, she also testified that there were other people that had access to her car that drove her around and she did not have a valid license, but it was the main person to do so. March 12, she was arrested. So then she was a release March 17, five days. When she gets released on March 17, she does testify that she contacts the defendant. Why does she have defended because she goes home and the car is not there. And when she got arrested, she instructed offended, take my car, take my belongings, take my keys to my mother's house. When she was released from jail, the car was not there. She called the defendant multiple times over five times. She testified. He did not answer. She asked me to testify. She went over to the defendant's house. He denied that he was not there on multiple occasions until the day that parked outside. And that is when she calls the police and tells her tells the police. The car is parked outside of his home, but he just left with he just left in it. Also, when he was there, she says that yes, she saw him on the balcony. He came down. She never said that she had a conversation with him on the balcony, but he came down and that's when he was she was trying to speak to him and he she described it as briefly. Okay. And it was after that on that same day that she reported the car stolen. All reasonable inferences from the evidence must be allowed in favor of the people. And it has to be a reasonable inference that that brief conversation and the reason why he was so abrupt and it was so brief was because she was telling him she wanted her car. She told if she was telling him she wanted her car. Wouldn't you think she testified that I told him I want my car. Don't you think she'd say that in court. I, I can't say what the record doesn't show justice peers. No, no, no, but you're arguing that it's a reasonable inference that she said that. And I'm saying. Another reasonable inference is if she said that she would have testified that she said that. In a perfect world and with a perfect. Well, I think Miss school. Yes. And you're doing a perfect job of this appeal. Let me just say for the record. Thank you, Justice. No matter what kind of a world you're in, doesn't the state have to show what she said? Because unless we know what she said, how can we. How do we know what the defendant believed because knowledge would be without knowing what she said. Because sometimes there's not direct proof and knowing now improving knowledge, but how hard would it be to ask her? What'd you say? I understand where you guys are going and I'm not taking I'm sure you do. We have the record and the record is the record and I am stressing that he the defendant had this vehicle for 23 days that we they go from a relationship from our interaction from him driving her around all the time. And then now it just ceases. And this is him. Try her to testify. That's what we do have her testifying that she tried to contact him. And it's believable that they have this type of interaction that she will contact him after she gets out of jail. And if they have this type of relationship, if he was not trying to deprive her of the car. I mean, this was a new car. Days later, he said, let the good times roll. And I want this car because I told you about it anyway. Well, I thought it was nice. So the defendant's wife took the defendant took the victim to get his car. Nice is a good way to put it. There's some inferences that we can make there as well. And that's another another issue that attorney brought up is that it wasn't the complaining witness that told the wife. It was the wife that called the witness. I mean, the complaining witness Johnson and told her that the car had been recovered by the police. And I think that's reason that I think that's something that should take notice. Because I believe it could be inferred that the wife knew first about the arrest of the defendant to the defendant's arrest. So it's speculation that a female voice called officer Morales. There was no reason why Miss Johnson would have to deny talking to the police. And she's the one who filed the police report. She's the one sitting up there testifying in court. And thank you. And based on that, like, it is the state's position that she brings up the fact of the credibility issue. And yes, we don't always have perfect witnesses, but we have to look at the behavior of this defendant. Now, whether this is whether this is foolish, whether this is the facts of this case could have been totally avoided a felony. That's not why we're here. His senseless and his foolish actions were a fit were a violation. And those acts committed were were elements that were proven by the juror, by the by the trier fact, our jury and a reviewing court cannot substitute the judgment of the of the trier fact involving the weight of the evidence. And clearly they gave the jury. They listened to this to Miss Johnson on the stand. Even when the evidence is against the manifest weight. Well, I mean, when the the the the finding is against the manifest weight of the evidence, the finding of the jury, we still can't look at it. We can't second guess it. Is that what you're saying? When, when the finding of the jury is against the manifest weight of the evidence, the reviewing court still should not consider that. Is that what you're arguing right now? That sounds like what you just said. I don't think you meant to say that. I meant to say that. I believe that the jury, the trier fact is in the best position to assess the credibility of the of the witness. We're not talking about so much credibility right now. We're talking about where their findings are against the manifest weight of the evidence. Yes, the court can do that. Okay. All right. And the issue here I think just as Coughlin just raised it a second ago, or maybe just as peers, but that did they ever, the question was never asked. Did you tell him that he could not use your car. And she's never answered that question even as we all stand here today. I haven't answered that question. Because that would, if you want to get to the knowledge issue, you've got to show somehow that the information was conveyed right. It's like picking someone up or on a body attachment or anything else and they don't even know that they're that they need to, that they were supposed to come to court, they were never received a summons or whatever the case or subpoena or whatever. So she's never said that she told him he could not drive the car. Back when she told him was here, take my car back. It's not real clear as to who was driving the car when she was arrested. There was one testimony as that. He was the driver, but on cross was stated that she she did clarify that she was in the passenger seat of the car. Right. He was driving. Pardon. And he was driving the car. Right. And he was driving the car. And the police ran her name found out she had a warrant and arrested her. And she told him to. Right, take my car. Yeah, not to just keep it I'll call you when to pick me up. When I get out of court, I mean get out of jail, return my return my car but we do have the evidence. You guys are your honor. We have to look at the days that pass, we have to look at her behavior. We have to look at her reaching out to have to look at their interaction. We have to look at his behavior. We have to look at the fact that he just left her standing out in front of her house on the sidewalk with both off in her car. That was eight days after she had been released from from jail, eight days of her trying to contact him calling and also going over there to his house in person. And it wasn't until that day that she. And it has to be that is reasonable inference again, that that is when she told him that he wanted her car back that he could not have the car, and the instruction 23.35 justice peers does define conversion property. The definition of converted property has been converted if a person lawfully entitled to possession of that property has been wrongfully deprived of permanency or permanent. It's not actually in the definition, and his actions, knowingly, because also in the statute, knowingly, look at the circumstance of the surrounding facts and circumstances. He had knowledge that he was didn't use her car. He had knowledge she was getting to work. He knew he wasn't the one driving her, and she testified other access to the car. He deprived her of this property. Belong to her, and he knew this. I know that the focus is on that one question, but we have all this other evidence that in when viewing in the light most favorable to us not most favorable to the defendant, as I believe that the defense is asking you to do, but it's most favorable to the state. It is the jury was correct in finding the defendant guilty. Justice Pierce were you about to ask a question. No, I was just gonna ask you to take another look at the statute because there's no definition of conversion in the statute that this defendant was indicted on. Okay, okay, I will do that. Okay. Thank you. Are there any more questions, and I would address the second issue, but this court has already ruled against the people regarding this issue. And I do know that this matters before the Supreme Court this very issue right now. I'm sorry, you know, when it's scheduled to be argued. It's being briefed right now. Okay. Yes. In the state's position is is that the trial court did properly. Sentence of the defense sentence of the defendant based as a class X offender using his based on his 1978 murder. Just so we're clear my school. I know you were telling us that that's the state argument in the Supreme Court is that the state's argument today as well. Yes, sir. Okay. All right. Anything further in the school. Nothing further. No, no, no, you're right. No justice. All right. Thank you. You're up. I think justice Coughlin got to the issue here, which is that the state had a job to do the state had a job, try to elicit this evidence from this witness, you know, as, as we know, not all witnesses are very, very lucid in their mind not every witness keep not every witness is going to know that you offer the key element that the state needs to prove the defendant guilty. That's why the state. That's why the state has this job to do to elicit the evidence and so we're trying to do the state's job here. There's no reason for us now to look at what the state failed to do a trial, and to do their jobs for them when they didn't do it themselves a trial we don't know what she would have said we truly don't. And I want to point out that Miss school didn't address what what Mr. Lenoir did in approaching the police that was sort of a lighted over in the entire argument, she would did not come she did not address, why would you approach, why would you say oh that's my car, that's what I would say if I'd run into Starbucks and parked illegally, when I was buying my when I was borrowing my friend's car, I would run out. I'd say that's my car please don't ticket it let me move it, because I knew that I hadn't committed a crime. If I thought I had committed a crime I behave very differently and might sneak away because he wasn't even near his house, his own actions here there, there are several different elements one the state just simply didn't do its job if the state was trying to prove this element, it didn't do it and there's no reason for us to do it for it now. Then there's the fact of Mr Lenoir his actions showing his own beliefs, why would somebody approach the police I really don't think that I've ever seen a case where somebody is possessing something illegally knows it's illegal, and then goes and claims it from the police saying that's mine, like come arrest me because I'm possessing this thing that's stolen or converted. And then there's also the matter of her credibility okay now we're supposed to assume that it was Mr Lenoir his wife who was calling, but she's, but, but it wasn't Mr Lenoir his wife who was talking to police on all these days that she said she wasn't talking to police it wasn't Mrs Lenoir Mr Lenoir his wife, who created this bizarre scenario where she's supposed to be driving her to Elk Grove village but never being in the car alone. She was not credible she said that she was driving as this court pointed out, she did say that she that Mr Lenoir was let go because he was the passenger. So she said she's driving we know she doesn't have a license and suddenly she slips and says well he was the passenger. She's just not a credible witness and so even if we're inclined to fill in and believe that everything that she said even though we can't believe so many of the things that she did say, if we're inclined to believe that she really did contact him really did go see him all of these things which is kind of a stretch given her credibility issues. Why didn't the state say, did you ask him for his car back, the state just didn't fill in the elements and we're not here to do the state's job. This is not a matter of trying to look at the evidence in the best light for the defense. This is simply looking at the evidence, is it there, and it's not, it's just simply not there. And so for these reasons we would ask that you would that that you would reverse his conviction for possession of a stolen motor vehicle and as for the second issue, because this issue is before the Illinois Supreme Court, then, then I will rest on my opening argument. Thank you so much. Okay, thank you Miss Pugh, thank you Miss Gould, thank you both for your excellence. Okay, this hearing is adjourned. Thank you. You're welcome. Have a good day.